**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|                                        |     |
|----------------------------------------|-----|
| LIONEL THOMAS,                         | )   |
|                                        | )   |
|     Plaintiff,     | )   |
|                                        | )   |
| v.                                     | )   |
|                                        | )   |
| HENRY PAULSON, Secretary[1],           | )   |
| Department of the Treasury,            | )   |
|                                        | )   |
|     Defendant.     | )   |
|                                        | )   |

Civil Action No. 03-187 (RBW)

_____

## MEMORANDUM OPINION

Lionel Thomas ("the plaintiff") brings this action against his employer, the Department of

the Treasury ("the defendant"), pursuant to, inter alia, Title VII of the Civil Rights Act of 1964

("Title VII"), 42 U.S.C. §§ 2000e et seq. (2000), alleging that he was discriminated against based

on his race when he was twice denied a promotion by the Bureau of Engraving and Printing

("BEP"), Facilities Planning and Management Division, and seeking compensatory damages and

equitable relief.[2]  Complaint ("Compl.") at 1, 4-6, 13.  Currently before the Court is the

---

[1]  Pursuant to Federal Rule of Civil Procedure 25(d)(1), the Court has substituted the current Secretary of the Treasury, Henry Paulson, for the former Secretary, John Snow, as the defendant in this action.

[2]  In his complaint, the plaintiff also alleges violations of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 et seq. (2000), the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §§ 2-1401 et seq. (2001), and the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412 (2000).  Complaint ("Compl.") at 1.  However, the plaintiff now concedes that he cannot state a claim upon which relief can be granted under the DCHRA because the BEP is a federal agency.  Plaintiff's Response to the Defendant's Statement of Material Facts Not in Genuine Dispute ("Pl.'s Resp.") at 11.  The plaintiff further concedes that his ADEA claim is meritless, acknowledging "that age . . . was not a determinative factor in his non-selection."  Memorandum of Points and Authorities in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp.") at 1 n.1.  Finally, the EAJA does not provide an independent cause of action for litigants in federal court; instead, it simply "authorizes the payment of fees to the prevailing party in an action against the United States."  Scarborough v. Principi, 541 U.S. 401, 405 (2004) (citation omitted).  Accordingly, the plaintiff's claims under the ADEA, the

(continued...)

defendant's motion for summary judgment ("Def.'s Mot.").[3]  For the reasons set forth below, the

defendant's motion is granted.

## I. Factual Background

The following facts are undisputed except where otherwise noted by the Court.[4]  The

plaintiff, an African-American male with thirty years' experience in the field of heating,

ventilation, and air conditioning ("HVAC"), has been employed at the BEP Power Plant in

Washington, D.C., as a Stationary Engineer since 1994.[5]  Compl. ¶ 4; Def.'s Mot., Exhibit

("Ex.") 4 (Affidavit of Lionel Thomas) ("Thomas Aff.") at 2; see also Pl.'s Suppl. Opp. at 4

(stating that the plaintiff "continues to be employed as a Stationary Engineer" as of October

2006).  The plaintiff's performance in this position "has been rated more than satisfactory

whenever he has been rated."  Compl. ¶ 4; see also Answer at 4.  Prior to his employment with

---

[2](...continued)
DCHRA, and the EAJA are dismissed.

[3]  In addition to those papers listed above, the following papers have been submitted in connection with this motion:  (1) Memorandum of Points and Authorities in Support of Defendant's Amended Motion for Summary Judgment ("Def.'s Mem."); (2) Defendant's Reply to Plaintiff's Opposition to Defendant's Amended Motion for Summary Judgment ("Def.'s Reply"); (3) Defendant's Statement of Material Facts Not in Genuine Dispute ("Def.'s Stmt."); (4) Defendant's Reply in Support of its Statement of Material Facts Not in Genuine Dispute ("Def.'s Resp."); (5) Plaintiff's Supplemental Opposition to Defendant's Amended Motion for Summary Judgment ("Pl.'s Suppl. Opp."); and (6) Defendant's Reply to Plaintiff's Supplemental Opposition to Defendant's Amended Motion for Summary Judgment ("Def.'s Suppl. Reply").

[4]  "In deciding whether there is a genuine issue of material fact [precluding a grant of summary judgment pursuant to Federal Rule of Civil Procedure 56(c)], the [C]ourt must assume the truth of all statements proffered by the non-movant except for conclusory allegations lacking any factual basis in the record."  Dist. Intown Props. Ltd. v. District of Columbia, 198 F.3d 874, 878 (D.C. Cir. 1999) (citation omitted).

[5]  The plaintiff alleges that "[i]n the past thirty years there have only been three African-American Stationary Engineers and never an African American manager at the BEP [P]ower [P]lant."  Pl.'s Suppl. Opp. at 3. He also alleges that at the time of the selection decision he is challenging, he was "the only African-American Stationary Engineer employed in the Power Plant."  Id.  The defendant disputes the plaintiff's allegations, contending that the manager of the BEP's Utilities & Energies Management Division is African-American and that there are currently three African-American Stationary Engineers other than the plaintiff, all of whom are employed in the waste fuel boiler group.  Answer at 4.

the BEP, the plaintiff, inter alia, attended several schools for vocational training, earned a

diploma from the Lincoln Technical Institute, and owned a HVAC business for ten years.

Thomas Aff. at 2 (detailing the plaintiff's educational and vocational experience); Pl.'s Suppl.

Opp. at 15 (same).  In addition, the plaintiff possesses a HVAC Master's License from the

District of Columbia.  Thomas Aff. at 2; Pl.'s Suppl. Opp. at 15.

### A.   The Acting Assistant Supervisor Vacancies

In 2001, the BEP advertised two vacancies for the position of Acting Stationary Engineer

Assistant Supervisor ("Acting Assistant Supervisor") through Vacancy Announcement No. 2001-

146-VMS.  Def.'s Stmt. ¶ 2; Pl.'s Resp. ¶ 2.[6]  Among other things, the major duties of the

position include the supervision of "employees[] engaged in the operation, maintenance and

repair of the [BEP] electric substation, high and low pressure steam distribution systems for

heating, drying, air-conditioning and refrigerating systems, and air and water pressure systems

throughout the 1.2 million square feet of the [BEP]."  Def.'s Mot., Ex. 7 (Position Description) at

2; see also id. at 3 (stating that an Acting Assistant Supervisor "[h]as general supervision over

approximately 12 employees consisting of Stationary Engineers and Maintenance Workers of the

Power Plant on one of three shifts"); Pl.'s Opp. at 16 (stating that an Acting Assistant Supervisor

---

[6]  The defendant contends that the plaintiff's response to its statement of material facts not in genuine dispute should be disregarded by the Court because it is unsigned and thereby fails to comply with the express requirement of Federal Rule of Civil Procedure 11(a) that "[e]very pleading, written motion, and other paper shall be signed by at least one attorney of record in the party's individual name."  Fed. R. Civ. P. 11(a) (also stating that "[a]n unsigned paper shall be stricken unless omission of the signature is corrected promptly after being called to the attention of the attorney or party"); see Def.'s Resp. at 1.  The defendant is correct that the plaintiff's unsigned response is in violation of Rule 11(a).  See Pl.'s Resp. at 13.  Moreover, the plaintiff failed to correct this inexplicable oversight when he refiled his response on October 31, 2006.  See Pl.'s Suppl. Opp., Ex. 4 (Plaintiff's Response to the Defendant's Statement Statement [sic] of Material Facts Not in Genuine Dispute) at 13.  However, because the Court concludes that the defendant is entitled to summary judgment on the plaintiff's claims even if the plaintiff's response to the defendant's statement of material facts is considered, it need not decide whether the response should be stricken.

"supervises employees engaged in the operation, maintenance[,] and repair of the [BEP] electric substation").  An Acting Assistant Supervisor must also be able, inter alia, "to direct emergency repairs requiring a knowledge of areas such as plumbing, steam fitting, [and] machine and electrical systems when journeym[e]n in th[o]se trades are off duty or are not readily available." Position Description at 3.  The plaintiff applied for this position in October 2001, along with four other applicants.  See Def.'s Stmt. ¶ 4 (stating that there were "five applicants for the position in question"); Pl.'s Resp. ¶ 4 (same); see also Def.'s Mot., Ex. 8 (October 11, 2001 Application of Lionel Thomas) ("Thomas Application") at 2-8.  Among the other applicants were William Turner, at that time a BEP Stationary Engineer and a Utility Systems Repair Operator Leader, Def.'s Mot., Ex. 8(b) (October 8, 2001 Application of William Turner) ("Turner Application") at 2-8; Def.'s Stmt. ¶ 21; Pl.'s Resp. ¶ 21, and Kendall Leatherman, at that time a BEP Stationary Engineer and the president and owner of Leatherman Electric Company, Def.'s Mot., Ex. 8(a) (October 2, 2001 Application of Kendall Leatherman) ("Leatherman Application") at 1, 3; Def.'s Stmt. ¶ 22; Pl.'s Resp. ¶ 22.[7]  Turner had held the position of Utility Systems Repair Operator Leader since June 1991, and in that capacity had supervised seven employees.  Turner Application at 8; Def.'s Stmt. ¶ 21; Pl.'s Resp. ¶ 21 (stating that Turner's supervisory experience is "[n]ot disputed, but not relevant").  And Leatherman supervised up to six employees at Leatherman Electric Company, see Def.'s Mot., Ex. 6 (June 21, 2002 Affidavit of Christopher Bowie) ("Bowie Aff.") at 6, in addition to serving previously as the foreman of twenty-five subordinates at another electrical business, id.; see also Def.'s Stmt. ¶ 22 (stating that

---

[7] Like the plaintiff, both Turner and Leatherman received the highest possible rating in their respective BEP employee performance reviews.  See Turner Application at 2-3; Leatherman Application at 7-8.

4

"Leatherman had been a foreman responsible for twenty-five employees at R&D Electrical");

Pl.'s Resp. ¶ 22 (stating that Leatherman's supervisory experience is "[n]ot disputed, but not

relevant").[8]

### B.  The Selection Process

In connection with the selection process for the Acting Assistant Supervisor position, a

rating panel consisting of BEP employees Daniel Metcalfe, Sandra Tucker, and James Szamstel

reviewed each application package in November 2001, ranking them in five categories of

evaluation criteria according to the information provided by the applicants.  Def.'s Stmt. ¶ 4;

Pl.'s Resp. ¶ 4; see also Def.'s Mot., Ex. 9 (collection of documents relating to Acting Assistant

Supervisor selection process) at 4-18 (Merit Candidate Rating Sheets) ("Rating Sheets").

According the the BEP Personnel Manual, "[e]valuation criteria are the knowledge, skills, and

abilities ["KSAs"] required of a specific position, which are used to evaluate education,

---

[8]  As detailed further below, the defendant alleges, and the plaintiff does not dispute, that both Turner and Leatherman "[were] able to provide information in [their] application[s,] from past work experience to [their] present position[s], which showed specific abilities that would make [them] beneficial in a supervisory position."  Def.'s Mot., Ex. 6 (June 21, 2002 Affidavit of Christopher Bowie) ("Bowie Aff.") at 5, 6.  By contrast, the defendant alleges that the plaintiff's application provided a vague and thus uninformative recitation of his previous supervisory experience:

> I served as Store Work leader from 1971-1977 for Fort McNair and Cameron Station Commissary's. Serving as Perishable Manager, Assistant Produce Manager and Assistant Night Manager working with and supervising employees in every task performed to meet production and operations.  In 1987 while working at the Naval Research Laboratory as an Acting Supervisor I would manage the daily operations of the jobs.  Upon the migration with other Navy Operations and became the Public Works Center [sic] consisting of Small Contracts which involved all trades working together to complete the scheduled contracts.  Working with and supervising employees in their crafts.

Thomas Application at 5; see generally id. at 3-8 (comparing the plaintiff's application with the applications of Turner and Leatherman).  That is, the defendant alleges that other than an additional sentence stating that his role as Acting Supervisor at the Naval Research Laboratory in 1987 involved "preparing various reports and overseeing subordinates," id. at 2, the plaintiff's application provided no other details which might "adequately illustrate past and present examples of his experience in his own words to quantify his supervisory qualifications."  Bowie Aff. at 4.

experience, and outside activities against other qualified applicants. . . .   Evaluation criteria are

developed through an analysis of job requirements."  Def.'s Mot., Ex. 13 (BEP Personnel Manual

Chapter 35) ("Personnel Manual") at 335-1-5;[9] <u>see</u> <u>also</u> <u>id.</u> at 335-1-13 (stating that minimally-

qualified applicants "will be further evaluated to determine the degree to which they possess job-

related [KSAs]. . . .  [and] [t]he end product of the evaluation is a determination of the

applicant's demonstrated or potential ability to do the job").

For the position of Acting Assistant Supervisor, the five KSAs by which the application

packages were evaluated by the rating panel are (1) the applicants' "[k]nowledge of safety,

security, and internal control regulations within the Bureau"; (2) the applicants' "[a]bility to

exercise technical supervision over subordinate craft employees"; (3) the applicants' "[a]bility to

communicate effectively, both orally and in writing, on current and emerging production and

facility maintenance issues"; (4) the applicants' "[a]bility to direct the distribution of work in

accordance with the work of the program"; and (5) the applicants' "[a]bility to prepare and/or

direct the preparation of reports on production and facility maintenance issues."  <u>See</u> Rating

Sheets at 4-18; <u>see also</u> Personnel Manual at 335-1-13 (stating that "[a]n applicant's rating for

each KSA will be determined by information provided in his/her application package, including

information contained in submitted performance appraisals, supplemental statements, and

evidence presented of training, education, awards, etc.").  The rating panel then established a

composite application cut-off score of 16 out of a possible 25 points, which reduced the applicant

pool to four candidates (including the plaintiff) for the two vacancies.  Def.'s Stmt. ¶ 4; Pl.'s

---

[9]  Deposition transcripts and other documents that have been excerpted by the parties for attachment as
exhibits are herein cited according to their original pagination.

Resp. ¶ 4.  These four individuals comprised the "certificate of eligibles," indicating that they were deemed to be the "best qualified" candidates for the available Acting Assistant Supervisor positions.  Def.'s Stmt. ¶¶ 7, 9; Pl.'s Resp. ¶¶ 7, 9; Def.'s Mot., Ex. 9 at 1 (Certificate of Eligibles); see also Personnel Manual at 335-1-13, 335-1-14.  Of the four candidates, applicant Kendall Leatherman received a composite score of 22, the plaintiff and applicant William Turner received composite scores of 17, and applicant Christopher Nicholson received a composite score of 16.[10]  Def.'s Stmt. ¶ 6; Pl.'s Resp. ¶ 6; see Def.'s Mot., Ex. 9 at 3 (Merit Register).

The application packages of these four "best qualified" applicants were then forwarded to an interview panel consisting of BEP supervisors Ronald Rye, John Stevenson, and Christopher Bowie.[11]  Def.'s Stmt. ¶¶ 10-11; Pl.'s Resp. ¶¶ 10-11; see Bowie Aff. at 2-9 (describing the

---

[10]  Thus, the rating panel scored the plaintiff's application package equal to Turner's, but significantly lower than Leatherman's.  See Rating Sheets at 3.  An examination of the plaintiff's rating sheets reveals that Metcalfe and Tucker each gave the plaintiff 1 out of a possible 5 points in the category of his "[a]bility to direct the distribution of work in accordance with the work of the program," for which Szamstel gave the plaintiff a score of 3 out of 5.  See id. at 7, 13, 18.  By contrast, Leatherman was given a score of 5 in this category by all three raters, id. at 8, 11, 15, while Turner was given a score of 5 in this category by Szamstel and Tucker and a score of 3 in this category by Metcalfe, id. at 6, 12, 17.  Of all the categories scored by all of the raters, the plaintiff only outscored Turner and/or Leatherman in three instances: (1) Tucker's evaluation of the applicants' "[k]nowledge of safety, security, and internal control regulations within the Bureau," on which the plaintiff outscored both Turner and Leatherman, compare id. at 18 with id. at 15, 17; (2) Szamstel's evaluation of the applicants' "[a]bility to prepare and/or direct the preparation of reports on production and facility maintenance issues," on which the plaintiff outscored Turner but not Leatherman, compare id. at 6 with id. at 7; and (3) Metcalfe's evaluation of the applicants' "[a]bility to prepare and/or direct the preparation of reports on production and facility maintenance issues," on which the plaintiff outscored Turner but not Leatherman, compare id. at 12 with id. at 13.

[11]  At the time of the interviews, Rye held the position of Stationary Engineer Supervisor at the Power Plant facility, Bowie held the position of Assistant Stationary Engineer Supervisor at the Power Plant facility, and Stevenson held the position of Supervisor of the BEP's Office of Facilities Engineering Plumbing and Sheet Metal Shop.  Def.'s Mot., Ex. 5 (June 12, 2002 Affidavit of John Stevenson) ("Stevenson Aff.") at 1; Bowie Aff. at 2.  Rye retired from the BEP on December 29, 2001.  Bowie Aff. at 2.  Although Rye, as Stationary Engineer Supervisor, was officially the chair of the interview panel, he delegated the duties of that position to Bowie in light of his impending retirement.  Id.  Thus, Bowie was responsible during the interview for asking the candidates "all questions pertaining to the interview itself."  Id. at 9.  Each of the four candidates was "asked the exact identical questions" during the interview, id.; see Def.'s Stmt. ¶ 10 (stating that "[t]he panel asked the same questions of each of the 'best qualified' applicants"); Pl.'s Resp. ¶ 10 (same), and "each applicant [was] given the same amount of time to respond to the questions," Def.'s Suppl. Reply, Ex. 4 (September 14, 2006 Deposition of Ronald Rye) ("Rye Dep.") at 77:17-
(continued...)

7

interview process).  Id. at 9.  After interviewing each of the four candidates, the panel

recommended to the selecting official, James Sirinakis, that William Turner and Kendall

Leatherman, both white males, be selected for the vacant Acting Assistant Supervisor positions.

Def.'s Mot., Ex. 4 (December 10, 2001 memo from Ronald Rye to James Sirinakis) at 8 (stating

the panel's belief that Turner and Leatherman "have demonstrated the knowledge, skills[,] and

abilities that make them the most desirable for the [position of Acting Assistant Supervisor] from

the certificate of eligibles").  In January 2002, Sirinakis followed the recommendation of the

interview panel and selected Turner and Leatherman.  Def.'s Stmt. ¶ 20; Pl.'s Resp. ¶ 20; see

Def.'s Mot., Ex. 4 (Affidavit of James Sirinakis) ("Sirinakis Aff.") at 5-6.  In making this

selection, Sirinakis "relied solely on the recommendation provided by [the interview panel] . . .

[and] did not review any of the [application material provided by the candidates]."  Sirinakis Aff.

at 6 (also stating that he "had no reason to question the judgment of the recommending

officials").  Moreover, Sirinakis represents, and the plaintiff does not dispute, that he "was not

aware of [the plaintiff's] . . . color or race" at the time the selection was made.  Id.; see Def.'s

Stmt. ¶ 17; Pl.'s Resp. ¶ 17.

   *C.  The Panel's Stated Reasons for its Recommendations*

   According to Bowie and Rye, the interview panel based the recommendations they

provided to Sirinakis primarily on the basis of the candidates' ability to demonstrate, through

their interviews and application materials, that they possessed the appropriate supervisory

---

[11](...continued)
19.  These questions were not generated by the panel itself, but by the BEP Office of Facility Engineering, now
called the Office of Facility Support.  Bowie Aff. at 9; see id. at 8-9 (describing the "set of bulleted instructions"
provided to the panel along with the questions that outlined the interview process).

qualifications for selection as an Acting Assistant Supervisor.[12]  See, e.g., Def.'s Suppl. Reply,

Ex. 3 (September 14, 2006 deposition of Christopher Bowie) ("Bowie Dep.") at 40:7-13 (stating

that "clarity had to be delivered from the application for this position of [Acting Assistant

Supervisor] and from the oral interview to be informative enough to feel comfortable and

confident that a person can do the supervisory role which encapsulates the whole operation"),

57:7-10 (stating that "to be an assistant supervisor, you have to show credible evidence and

quantifiable substance to show how you would be best suited for that position"); Def.'s Suppl.

Reply, Ex. 4 (September 14, 2006 Deposition of Ronald Rye) ("Rye Dep.") at 58:17-18 (stating

that the candidates' "answer[s] on the interview questionnaire and their applications" led him to

recommend Turner and Leatherman for the Acting Assistant Supervisor position over the

plaintiff).  The defendant further contends that the interview panel recommended that Turner and

Leatherman be selected for the Acting Assistant Supervisor position because they were best able

to give "clear, articulate responses to what positions they held, the number of people they

supervised, the impact their job had on the mission of where they worked, [and examples of]

scenarios of situations and how they remediated them [as supervisors]."  Bowie Dep. at 36:21-

37:4; see also id. at 36:2-7 (stating that Turner and Leatherman "better illustrated" the "work-

related experience" that "quantif[ied] . . . [their] being able to work in a supervisory capacity"),

59:13-17 (stating that the plaintiff's responses were not "as quantifiable and in depth as the other

---

[12]  Unlike Rye and Bowie, Stevenson does not indicate in his brief affidavit why Turner and Leatherman were recommended for the Acting Assistant Supervisor positions over the plaintiff.  See generally Stevenson Aff. Instead, Stevenson states that he "was neither consulted, nor would [he] expect to be consulted by Mr. Rye and/or Mr. Bowie during the selection process," because "[t]he review of the [candidates' application packages] and the 30 to 45 minute interview panel question process would not qualify [him, as a supervisor in a different BEP office,] to make a promotion decision for the Power Plant."  Id. at 2 (stating also that the plaintiff and Leatherman "are current employees of the BEP Power Plant, and therefore, each has worked under the direct supervision of Mr. Rye and Mr. Bowie").

applicants"); see Rye Dep. at 48:13-15, 49:7-10, 58:3-6 (stating that while the plaintiff "did well"

in the interview, "there were certain things that Mr. Leatherman answered in a better form than

[the plaintiff] did . . . [and] certain things that . . . [the plaintiff] didn't answer to the satisfaction

of the panel").

Indeed, Bowie elaborates in great detail numerous reasons for his belief that neither the

plaintiff's application nor his interview "clearly articulated" the supervisory qualities sought by

the interview panel, Bowie Dep. at 57:15-17, particularly when compared to the responses

provided by Turner and Leatherman.[13]    See, e.g., id. at 37:22-38:5 (stating that the plaintiff's

---

[13]  The plaintiff contests the salience of Bowie's representations as a general matter, asserting that "the
defendant relies almost exclusively on the declaration of . . . only one of the three interview panel members."  Pl.'s
Suppl. Opp. at 16.  It is certainly true that Bowie's detailed account of, and justification for, the interview panel's
recommendations to Sirakis—and, specifically, his impression of the relative performances and qualifications of the
interviewees—should not necessarily be imputed to the panel as a whole or assumed automatically to be reflective of
the feelings of the other two panel members, Rye and Stevenson.  However, it is important to note that nothing in the
record before this Court, and certainly nothing provided by the plaintiff, indicates that Rye or Stevenson had
opinions different from Bowie's on this topic in any material respect.  Rye intimates simply that the candidates'
"answer[s] on the interview questionnaire and their applications" were determinative of his recommendation, Rye
Dep. at 58:17-18, and states that while the plaintiff "did well" in the interview, "there were certain things that Mr.
Leatherman answered in a better form than [the plaintiff] did . . . [and] certain things that . . . [the plaintiff] didn't
answer to the satisfaction of the panel," id. at 48:13-15, 49:7-10, 58:3-6.  Stevenson, in turn, abdicates all
responsibility for any promotion decisions.  See Stevenson Aff. at 2.  Moreover, while the plaintiff could have
further developed the record as to the stated reasons behind the interview panel's recommendations, he did not do so.
For example, the plaintiff failed to depose Stevenson, and deposed Rye only five years after the fact, when his
recollection of the events had become clouded.  See Rye Dep. at 28:10-30:20 (stating that he could not recall when
he began supervising the plaintiff and Leatherman), 32:2-37:8 (stating that he could not recall the extent to which the
plaintiff and Leatherman had each received HVAC training), 49:18-20 (stating that he could not recall specifically
how Leatherman outperformed the plaintiff in the interview because "that's almost five years ago and . . . I just
cannot remember everything that went on then").  In addition, unlike Bowie and Stevenson, Rye did not submit an
affidavit in connection with the Equal Employment Opportunity Commission ("EEOC") investigation of the
plaintiff's complaint, presumably because at the time the plaintiff filed his complaint with the EEOC, Rye had retired
from the BEP and was therefore not readily available.  See Bowie Aff. at 2 (stating that Rye "retired [on] December
29, 2001").  Because "[a] successful plaintiff in a Title VII case must first establish a prima facie case of racial
discrimination," the initial burden in this case rests squarely with the plaintiff to demonstrate, inter alia, that his non-
selection "gives rise to [a] [discriminatory] inference."  Vickers v. Powell, ___ F.3d ____, ____, 2007 WL 1952369,
at *5 (D.C. Cir. July 6, 2007) (internal quotation marks and citation omitted).  Thus, absent contrary evidence from
the plaintiff (which he has not provided), the Court has no reservations about accepting Bowie's detailed affidavit,
submitted in connection with the EEOC complaint, as an accurate representation of the panel's reasons for
recommending that Turner and Leatherman be selected over the plaintiff for the position of Acting Assistant
Supervisor.

application provided "a lot of reference to supervising and being at different positions, but [offered] no real extrapolation on what his responsibilities were, no real examples of problems encountered[,] and no clear examples of remediation"); see also Thomas Application at 5; see generally Bowie Aff. at 3-8.[14]  Specifically, Bowie represents, inter alia, that

> Mr. Thomas was not able[, in his application material,] to extrapolate on the appropriate knowledge, skills, and abilities which would make a correlation from his past to present positions to adequately make him a suitable candidate for [the Acting Assistant Supervisor position].  [His reference to his] past experience at the Naval Research Laboratory provided no elaboration on his supervisory experience [there] . . . [and] does not expand on the actual responsibilities he had, . . . the number of subordinates he supervised, or . . . the tasks and/or accomplishments he may have initiated or supported.  Mr. Thomas mentions supervising employees in their crafts but does not elaborate to show to what extent [he supervised them], or what the crafts responsibilities were and how he may have gained experience in regard to organizing their tasks to reach the goal of the mission/operation.  Mr. Thomas did not include any illustrations or examples that would support his experience with employee issues pertaining to specific interventions he had supervising employees. . . .  Mr. Thomas references being a store work leader . . . but did not elaborate on his responsibilities while in the leader position. . . .  Mr. Thomas mentions supervising, managing, communicating, reports, etc. but does not specifically elaborate or explain how his past experience shows a correlation to a supervisor's responsibilities in a HVAC/Utility based mechanical operation.  [His] work experience was mainly illustrated using the verbiage of respective [position descriptions] from his past and present positions, and rating element criteria from his present position.  Mr. Thomas was not able to adequately illustrate past and present examples of his experience in his own words to quantify his supervisory qualifications.

---

[14]  In addition, Bowie stated in his deposition that he believed that the plaintiff does not "have a clear understanding of his duties as [they] pertain[] to electrical to qualify for th[e] position of [Acting Assistant Supervisor]."  Bowie Dep. at 66:11-15; see also Def.'s Mem. at 12 (arguing that Turner and Leatherman were better qualified than the plaintiff because "they had greater experience in electrical work and could better articulate their supervisory experience and goals"); Def.'s Suppl. Reply at 6 (asserting that "[u]nlike [the] [p]laintiff, the selectees had extensive supervisory experience as well as experience and training in both HVAC and electrical") (emphasis in original).  However, because (1) the Court concludes that the plaintiff has failed to establish that his qualifications as a supervisor "were sufficiently superior to those of [the selectees] to allow a jury to infer discrimination," Holcomb v. Powell, 433 F.3d 889, 897 (D.C. Cir. 2006) (citation omitted); and (2) the record indicates that the candidates' respective supervisory qualifications were of significant importance to the interviewing panel in assessing each candidate's suitability for the Acting Assistant Supervisor position, see Bowie Aff. at 3-8, it is unnecessary to determine exactly whether, and to what extent, the plaintiff's apparent comparative lack of electrical experience was more relevant to the duties of an Acting Assistant Supervisor than his ostensibly greater comparative HVAC experience.

Bowie Aff. at 3-4 (emphases added).  Nor, in Bowie's view, was the plaintiff's interview any

more successful in communicating the supervisory qualities necessary to the position of Acting

Assistant Supervisor:

> Mr. Thomas's oral interview resulted in his lacking the ability to precisely answer
> questions concerning [his manner of] dealing with subordinates in a supervisory
> capacity.  Mr. Thomas did not articulate his understanding of personnel situations,
> and his answers were weak and not specific [when] offering remedies to different
> scenarios [posed by the interview questions].  Mr. Thomas did not provide clear[,]
> decisive answers to the interviewer and the other panel members.  Mr. Thomas did
> not clearly explain his [past] supervisory positions, and he was very apprehensive to
> offer or give specific suggestions to improve the Power Plant shop.  Mr. Thomas's
> statements were very general and not specific to his experiences.

Id. at 4.  Bowie also details his reasons for recommending that Turner and Leatherman be

selected.  For example, Bowie states that in his application and interview, Turner

> was able to demonstrate a wide range of knowledge from experience as a fill in
> supervisor for a mechanical contractor before his government career.  It was apparent
> he was able to acquire early[] a good working knowledge, skill, and ability to oversee
> personnel in the HVAC/Utility based mechanical trade.  He demonstrated a clear
> decisive understanding of supervising personnel in the installation, service, and repair
> of various types of [HVAC] systems, and the ability to work with and interpret
> blueprints to his subordinates. . . .  He was able to demonstrate various ways his
> knowledge, skills, and abilities were beneficial [with] regard to the installation,
> service, and maintenance of various forms of equipment which not only pertained to
> HVAC, but to the four major utilities . . . [for] which [an Acting Assistant
> Supervisor] would be held responsible . . . within the Power Plant operation.  Mr.
> Turner was able to provide a categorized list of tools and test equipment, as well as
> how they are used, making it apparent that he could assist and direct personnel when
> it was needed. . . .  In his work leader capacity, he orchestrated and prioritized
> various jobs for personnel assigned to him.  He inspected and analyzed the work of
> his subordinates during each phase of assignment, and upon completion, he would
> assure complaince.  He gave examples of how he trained personnel in proper work
> procedures and in maintaining a safe work environment. . . .  He also emphasized his
> ability to delegate and prioritize assignments. . . .  <u>Mr. Turner's oral interview
> resulted in his ability to precisely answer questions about dealing with subordinates
> in a supervisory capacity.  He articulated his understanding of personnel situations
> and gave remedies to resolving different scenarios in the oral questions.</u>  He was very
> focused in his responses and made [them] clear[ly] to the interviewer and other panel

> members.  He explained his supervisory responsibilities in his previous positions[]
> and offered suggestions of improved communication between shifts at his present
> position.

Id. at 5-6 (emphasis added).  Similarly, Bowie states that Leatherman

> was able to demonstrate a diversified range of knowledge, skills, and abilities from
> his past [supervisory] experience. . . .  In his role as president of Leatherman Electric,
> he stressed his commitment to communicating to his subordinates the importance of
> communication and internal control for personnel safety and security.  Mr.
> Leatherman's experience as a small business owner and [Emergency Medical
> Technician] always puts him in the position of exercising technical supervision over
> subordinate[s] . . . and would enable him to handle emergency situations. . . .  He
> clearly articulated and referenced in his application his ability to delegate and
> prioritize assignments.  Mr. Leatherman's oral interview resulted in his ability to
> precisely answer questions about dealing with subordinates in a supervisory capacity.
> He provided excellent positive and negative scenarios[] which a supervisor will
> encounter with subordinates. . . .  He also expanded on possible resolutions to the
> examples given to him in the oral interview.  He remained very focused and
> articulated specifics [with] respect to the answers he provided to the questions.  He
> reiterated his supervisory responsibilities in his previous work experiences[] and
> offered suggestions of improved communication between shifts at his present
> position.

Id. at 6-8 (emphases added) (also comparing the plaintiff to Leatherman and stating that the

plaintiff "did not articulate or sufficiently explain the experiences he has had[] and how they . . .

direct[ly] . . . correlat[e] to being suitable for th[e] [Acting Assistant Supervisor] position").

   D.  The Present Lawsuit

   After unsuccessfully challenging the BEP's selection decision through the appropriate

administrative channels, see Def.'s Stmt. ¶ 24; Pl.'s Stmt. ¶ 24, the plaintiff filed this lawsuit on

February 5, 2003, arguing that he "was clearly better qualified for the promotion to the position

of [Acting Assistant Supervisor] than the selectees" and that his non-selection was the result of

intentional racial discrimination by the selecting officials.[15]  Compl. ¶ 11.  The defendant filed

---

[15]  On Janury 21, 2004, during the early stages of discovery in this case, the defendant served the plaintiff with interrogatories, discovery requests, and requests for admissions.  When the plaintiff did not respond in a timely manner, the defendant moved on May 14, 2004, to dismiss the complaint or, alternatively, to deem the admission requests admitted pursuant to Federal Rule of Civil Procedure 36(a), which provides, in pertinent part, that a matter is deemed admitted unless a party responds to an admission request within thirty days after that request has been served.  See Fed. R. Civ. P. 36(a).  Among the statements to which the defendant requested that the plaintiff admit were: (1) that the plaintiff's qualifications "were not superior to those of" the candidates hired to fill the job vacancies for which the plaintiff had applied, Defendant's Requests for Admission to Plaintiff at 3; and (2) that "other than [the plaintiff's] own testimony and belief," he had no independent evidence that he had been discriminated against or that "race was a motivating factor or played any role" in his non-selection, id. at 3-5.

The plaintiff delivered his discovery responses, including his responses to the admission requests, on May 17, 2004, three days after the defendant filed its motion to dismiss.  In response to the defendant's motion, the plaintiff contended that the defendant had not been prejudiced by the delay in being provided discovery responses, and argued in consequence that even if the admissions were deemed admitted under Rule 36(a), the Court should permit him to withdraw or amend his admissions pursuant to Rule 36(b), in accordance with "the judicial policy for promoting just and complete resolution on the merits."  Plaintiff's Opposition to Defendant's Motion to Dismiss at 2; see Fed. R. Civ. P. 36(b).

The Court issued its ruling in November 2004, denying the defendant's motion to dismiss but deeming the admissions requests admitted.  See November 5, 2004 Order at 8.  In so doing, the Court noted that

> [t]he plaintiff correctly cites Rule 36(b) for the proposition that "the court may permit withdrawal or amendment when the presentation of the merits of the action will be subserved [thereby] and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits."

Id. at 6 (quoting Fed. R. Civ. P. 36(b)).  The Court did not address the plaintiff's arguments regarding Rule 36(b), however.  Specifically, it did not evaluate whether "presentation of the merits of the action will be subserved" by amendment or withdrawal of the admissions, nor whether the defendant had demonstrated that it would be prejudiced in maintaining its defense on the merits if the plaintiff were allowed to withdraw or amend the admissions.  Rather, the Court simply noted that the plaintiff had failed to respond to the requests for admission within 30 days, and that they were therefore deemed admitted under Rule 36(a).  November 5, 2004 Order at 6-7.

Renewing his Rule 36(b) motion for withdrawal or amendment of the admissions in his opposition to the defendant's motion for summary judgment, the plaintiff opined that "[t]he admissions granted by the [C]ourt effectually gut the merits of the plaintiff's prima facie case," Pl.'s Opp. at 8, and argued that "more than a failure to meet deadlines is required to deny a party relief from an admission," id. at 9 (quoting Raiser v. Utah County, 409 F.3d 1243, 1247 (10th Cir. 2005)).  Instead, the plaintiff asserted that the defendant must show that it will be prejudiced on the merits by withdrawal or amendment of the admissions, which it had not done.  Id. at 9-10; see Fed. R. Civ. 36(b) (stating that "the party who obtained the admission [must] satisfy the [C]ourt that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits"); see also Raiser, 409 F.3d at 1247 (stating that "the [C]ourt's focus [in considering a Rule 36(b) motion] must be on the effect upon the litigation and prejudice to the resisting party") (internal quotation marks and citation omitted).  In response, the defendant argued it had "relied on the deemed admissions" in moving for summary judgment and "[might] well have conducted additional discovery in this case" had the Court initially allowed the plaintiff to withdraw or amend them.  Def.'s Reply at 4.

At a status hearing held on August 15, 2006, the Court concluded that the prejudice that the plaintiff would suffer if the Court were to permit the case to be resolved on the basis of deemed admissions that patently preclude a decision on the merits of the plaintiff's claims clearly outweighed whatever prejudice would be suffered by the defendant if the admissions were to be withdrawn pursuant to Rule 36(b).  See Conlon v. United States, 474 F.3d

(continued...)

14

its motion for summary judgment on February 14, 2006, arguing that its "decision not to select the [p]laintiff for one of the positions in question was based on legitimate non-discriminatory reasons, and was in no way a pretext to discriminate against him."[16]  Def.'s Mem. at 17; see

---

[15](...continued)
616, 624 (9th Cir. 2007) (concluding that "reliance on a deemed admission in preparing a summary judgment motion does not constitute prejudice," even where the defendant "relied on the deemed admissions in choosing not to engage in any other discovery") (citations omitted); accord In re Durability, Inc., 212 F.3d 551, 556 (10th Cir. 2000) (observing that the rule that such reliance on a deemed admission does not constitute prejudice "accords with the principle that summary judgment should not be employed to deprive litigants of their right to a full hearing on the merits, if any real issue of fact is tendered") (internal quotation marks and citation omitted); FDIC v. Prusia, 18 F.3d 637, 640 (8th Cir. 1994) (holding that "[t]he necessity of having to convince the trier of fact of the truth of a matter erroneously admitted is not sufficient [to establish prejudice]") (citations omitted).  The Court therefore allowed the parties to engage in limited additional discovery to mitigate the impact of the Court's decision not to permit the previously deemed admissions to remain in effect.  See August 17, 2006 Order at 1 (granting the plaintiff leave to depose Rye and Bowie and directing the parties to file supplemental briefs on the defendant's motion for summary judgment).  Notably, the defendant did not represent at the August 15, 2006 hearing that it required additional discovery in light of the withdrawn admissions.  See id.

[16]  The defendant also argues that its motion for summary judgment should be granted on two additional grounds.  First, the defendant contends that "[t]he Court's November 5, 2004 Order deeming [the] [d]efendant's requests for admissions as admitted has not been vacated," Def.'s Suppl. Reply at 3, and that the plaintiff has therefore admitted that his qualifications are not superior to those of the selectees and that he has no independent evidence that  "race was a motivating factor or played any role" in his non-selection, Defendant's Requests for Admission to Plaintiff at 5; see id. at 3-5; see also Def.'s Mem. at 10 (arguing that the Court should grant judgment as a matter of law on the basis of the deemed admissions).  To the extent that the Court did not, at the August 15, 2006 status hearing, formally vacate the portion of its November 5, 2004 Order deeming the defendant's requests for admissions admitted by the plaintiff, it does so now.  See Conlon, 474 F.3d at 623; Raiser, 409 F.3d at 1247.
    Second, the defendant asserts that because Sirinakis, as the selecting official, was not aware of the plaintiff's race or color at the time the selection decisions were made, those decisions "could not have been influenced or motivated by any discriminatory animus."  Def.'s Suppl. Reply at 3; see Def.'s Mem. at 10; Def.'s Stmt. ¶ 17; Pl.'s Resp. ¶ 17.  The plaintiff responds to this argument by claiming that although Sirinakis was the "ultimate decision-maker," he was "not really the substantive decision-maker at issue in this case," and "Christopher Bowie and Ronald Rye were the real decision-makers."  Pl.'s Suppl. Opp. at 10.  The plaintiff cites no caselaw in support of this claim, instead relying exclusively on Rye's statement that his selection recommendations have been adopted "without exception" by the selecting official.  Id. at 10-11.  Notwithstanding the plaintiff's tepid rebuttal of the defendant's argument in this regard, the Court agrees that employers may be liable under Title VII in "situation[s] in which a decisionmaker gives perfunctory approval for an adverse employment action explicitly recommended by a biased subordinate."  EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles, 450 F.3d 476, 484-85 (10th Cir. 2006) (citations omitted) (terming this the "'rubber stamp' doctrine"); see Hill v. Lockheed Martin Logistics Mgmt., 354 F.3d 277, 288-89 (4th Cir. 2004) (citing Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000), for the proposition "that the person allegedly acting pursuant to a discriminatory animus need not be the 'formal decisionmaker' to impose liability upon an employer for an adverse employment action, so long as the plaintiff presents sufficient evidence to establish that the subordinate was the one 'principally responsible' for, or the 'actual decisionmaker' behind, the action"); see also Sirinakis Aff. at 6 (stating that he "relied solely on the recommendation provided by [the interview panel] . . . [and] did not review any of the [application material provided by the candidates]" because he "had no reason to question the judgment of the recommending officials").

(continued...)

Def.'s Suppl. Reply at 3 (asserting that "[the] [p]laintiff has been unable to demonstrate evidence sufficient to overcome [the stated non-discriminatory reasons for the BEP's selection decisions]").  In response, the plaintiff contends that his "training, experience, and [HVAC] certifications demonstrate that he is 'significantly better qualified' for the [Acting Assistant Supervisor] position to such a point that a 'wide and inexplicable gulf' exists between [him] and the other [candidates]."  Pl.'s Suppl. Opp. at 12; see also id. (stating that "[t]he obvious comparisons between [the plaintiff's] application and the other [candidates], especially Mr. Leatherman, jump off the page with their stark inequalities in education, work experience, tenure at the BEP, certifications, etc.").[17]  The plaintiff also alleges, in roundabout fashion, that the dearth of African-American supervisors and Stationary Engineers at the BEP Power Plant is indicative of intentional, organization-wide racial discrimination.  See, e.g., id. at 9.

## II. Standard of Review

Courts will grant a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When

---

[16](...continued)
Nevertheless, because the Court concludes that the defendant is entitled to summary judgment on the plaintiff's Title VII claims even if Rye and Bowie were the "actual decisionmakers" responsible for the plaintiff's non-selection, Hill, 450 F.3d at 485 (citation omitted), it is unnecessary to decide this issue.

[17]  The plaintiff's briefs devote curiously little time to any discussion of the panel's recommendation of selectee Turner for the Acting Assistant Supervisor position, focusing almost exclusively on a comparison between the plaintiff and selectee Leatherman.  See generally Pl.'s Opp. (mentioning Turner by name only three times in twenty pages, all during the plaintiff's statement of the facts of the case); Pl.'s Suppl. Opp. (same).  Indeed, at no point does the plaintiff directly address, in any way whatsoever, Turner's relative qualifications for the position of Acting Assistant Supervisor.  Needless to say, this omission makes it more difficult for the Court to fully evaluate the plaintiff's conclusory assertion that "[t]he candidates selected . . . had less training, experience, and qualifications than [did he]."  Pl.'s Suppl. Opp. at 14 (emphasis added).

ruling on a Rule 56(c) motion, the Court must view the evidence in the light most favorable to the non-moving party.  Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006) (citing Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000)).  The Court must therefore draw "all justifiable inferences" in the non-moving party's favor and accept the non-moving party's evidence as true.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  The non-moving party, however, cannot rely on "mere allegations or denials," Burke v. Gould, 286 F.3d 513, 517 (D.C. Cir. 2002) (quoting Anderson, 477 U.S. at 248) (internal quotation marks omitted), and "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citation omitted). Simply put, "conclusory allegations unsupported by factual data will not create a triable issue of fact."  Pub. Citizen Health Research Group v. FDA, 185 F.3d 898, 908 (D.C. Cir. 1999) (internal quotation marks and citations omitted).  Rather, to withstand a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  "[T]here is no [genuine] issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party," Anderson, 477 U.S. at 249 (citation omitted), and if the Court concludes that the evidence adduced by the non-moving party "is merely colorable . . . or is not significantly probative," id. (citations omitted), or if the non-moving party has otherwise "failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof," Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), then the moving party is entitled to summary judgment.  Finally, "[a]ll supporting and opposing affidavits [submitted in connection with a Rule 56(c) motion] shall be made on personal knowledge, shall set forth such facts as would be

17

admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e).

### III. Legal Analysis

Title VII provides, in relevant part, that all "personnel actions affecting employees or applicants for employment . . . in executive agencies . . . shall be made free from any discrimination based on race."  42 U.S.C. § 2000e-16(a).  In evaluating claims of racial discrimination in employment under Title VII, it is useful to remember the District of Columbia Circuit's repeated admonition that the statute does not, and was not intended to, transform the Court into "a super-personnel department that reexamines an entity's business decisions." Holcomb, 433 F.3d at 897 (internal quotation marks and citations omitted).  Indeed, "Title VII liability cannot rest solely upon a judge's determination that an employer [has] misjudged the relative qualifications of admittedly qualified candidates."  Fischbach v. District of Columbia Dep't of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (citation omitted).  "Short of finding that the employer's stated reason [for its selection decision] was [merely] a pretext [for unlawful discrimination,] . . . the [C]ourt must respect the employer's unfettered discretion to choose among qualified candidates."  Id. (citations omitted).  In this regard, "the ultimate burden of persuading the trier of fact that the [employer] intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Reeves, 530 U.S. at 142 (internal quotation marks and citation omitted).

Where, as here, the plaintiff has not proffered any direct evidence of intentional discrimination, his race discrimination claims under Title VII are evaluated pursuant to the burden-shifting framework first articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792,

803-805 (1973).[18]  Weber v. Battista, ___ F.3d _____, _____, 2007 WL 2033254, at *2-3 (D.C.

Cir. July 17, 2007).  Under this framework, the plaintiff bears the initial burden of "establish[ing]

a prima facie case of discrimination by a preponderance of the evidence."  Id. (internal quotation

marks and citation omitted).  To do so in the context of an adverse selection decision, the

plaintiff must demonstrate that "(1) he is a member of a protected class; (2) he applied for and

was qualified for an available position; (3) despite his qualifications[,] he was rejected; and (4)

either someone filled the position[,] or the position remained vacant and the employer continued

to seek applicants."  Jackson v. Gonzales, ___ F.3d ____, ____, 2007 WL 2275215, at *2 (D.C.

Cir. Aug. 10, 2007) (internal quotation marks, citation, and ellipsis omitted); see also Holcomb,

433 F.3d at 895 (same).  If the plaintiff succeeds in establishing a prima facie case in this

manner, "the burden shifts to the defendant employer to produce evidence that the plaintiff was

rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason."  Jackson,

___ F.3d at ____, 2007 WL 2275215, at *2 (quoting Reeves, 530 U.S. at 142) (internal quotation

marks omitted).  If the employer presents such an explanation, "to survive summary judgment the

plaintiff must show that a reasonable jury could conclude from all of the evidence that the

adverse employment decision was made for a discriminatory reason."  Holcomb, 433 F.3d at

896-97 (internal quotation marks and citation omitted); see Weber, ___ F.3d at ____, 2007 WL

2033254, at *2-3 (stating that "the plaintiff must [ultimately] demonstrate that the employer's

---

[18]  "Direct evidence of discrimination is evidence that, if believed by the fact finder, proves the particular fact in question without any need for inference.  Such evidence includes any statement or written document showing a discriminatory motive on its face."  Lemmons v. Georgetown Univ. Hosp., 431 F. Supp. 2d 76, 86 (D.D.C. 2006) (Walton, J.) (internal quotation marks, citations, and ellipsis omitted) (emphases in original).  The plaintiff does not argue, nor could he, that the factual record in this case contains any such direct evidence of discrimination.

stated reason was pretextual and that the true reason was discriminatory") (internal quotation marks and citation omitted).

Here, it is undisputed that the plaintiff is a member of a protected class, see Compl. ¶ 4; Def.'s Mem. at 10 n.6, that he applied, and was not selected, for two vacancies at the BEP Power Plant for the position of Acting Assistant Supervisor, see Def.'s Stmt. ¶¶ 2-3, 17; Pl.'s Resp. ¶¶ 2-3, 17, and that the vacancies were filled instead by other applicants not in the plaintiff's protected class, see Def.'s Stmt. ¶ 20; Pl.'s Resp. ¶ 20.  It is further undisputed that the plaintiff, along with selectees Turner and Leatherman, was deemed to be one of the "best qualified" candidates for the Acting Assistant Supervisor position.  Def.'s Stmt. ¶¶ 7, 9; Pl.'s Resp. ¶¶ 7, 9. As an initial matter, the Court therefore concludes, under the four-pronged test articulated most recently in Jackson v. Gonzales, that the plaintiff has established a prima facie case of racial discrimination in connection with his non-selection.  See Jackson, ___ F.3d at ___, 2007 WL 2275215, at *2.

It is also clear from the evidence that the defendant has articulated a legitimate, nondiscriminatory reason for its failure to select the plaintiff for the position of Acting Assistant Supervisor: namely, that the plaintiff, while generally qualified as a Stationary Engineer, did not possess—or, at least, did not sufficiently articulate in his application package and before the interview panel—the supervisory qualifications which would have made him a better overall candidate than selectees Turner or Leatherman for this particular position, which requires the "general supervision [of] approximately 12 employees."  Position Description at 3; see Rye Dep. at 38:2-3 (stating that the panel "look[ed] at [the candidates'] overall qualifications"); see also Holcomb, 433 F.3d at 129 (concluding that the defendant had articulated a legitimate,

nondiscriminatory reason for its failure to promote the plaintiff where the selecting official submitted an affidavit stating that "she chose [the selectee] because she was the best applicant and [because] the person with the best skills and abilities to do the job should be selected") (internal quotation marks omitted); George v. Leavitt, 407 F.3d 405, 412 (D.C. Cir. 2005) (describing "an absolute or relative lack of qualifications" as one of the "most common legitimate reasons on which the employer might rely to reject a job applicant") (internal quotation marks and citations omitted) (emphasis added).

The defendant proffers sworn statements from members of the interview panel responsible for recommending the selection of Turner and Leatherman, detailing the reasons for their belief that the plaintiff was not one of the two best-qualified candidates for the Acting Assistant Supervisor position.  See, e.g., Bowie Aff. at 8 (stating that the plaintiff "did not articulate or sufficiently explain the [supervisory] experiences he has had[] and how they . . . direct[ly] . . . correlat[e] to being suitable for th[e] [Acting Assistant Supervisor] position"); Bowie Dep. at 36:21-37:4 (stating that Turner and Leatherman, unlike the plaintiff gave "clear, articulate responses to what positions they held, the number of people they supervised, the impact their job had on the mission of where they worked, [and examples of] scenarios of situations and how they remediated them [as supervisors]"), 59:15-17 (stating that the plaintiff's responses were not "as quantifiable and in depth as the other applicants"); see Rye Dep. at 48:13-15, 49:7-10, 58:3-6 (stating that while the plaintiff "did well" in the interview, "there were certain things that Mr. Leatherman answered in a better form than [the plaintiff] did [and] certain things that . . . [the plaintiff] didn't answer to the satisfaction of the panel").  The defendant further points to the KSAs required for the Acting Assistant Supervisor position—those factors that enable the BEP

to make an objective "determination of [each] applicant's demonstrated or potential ability to do the job," Personnel Manual at 335-1-13—which specify that candidates for the position must be evaluated, in large part, on their "[a]bility to exercise technical supervision over subordinate craft employees[,] . . . [their] [a]bility to communicate effectively, both orally and in writing, on current and emerging production and facility maintenance issues[,] . . . [and their] [a]bility to direct the distribution of work in accordance with the work of the program." See Rating Sheets at 4-18. Based on these factors, the defendant contends that the sole reason that the plaintiff was not selected for the Acting Assistant Supervisor position was that the interview panel—and, acting on their consensus recommendation, the selecting official—"honestly believe[d]" that the plaintiff was not one of the two best-qualified candidates for the advertised vacancies, George, 407 F.3d at 415 (internal quotation marks and citation omitted), given the respective application packages and interviews. See Def.'s Mem. at 13-19; Bowie Aff. at 3-8.

Because the Court finds that the evidence produced by the defendant is more than sufficient to "constitute[] a legitimate, nondiscriminatory reason for the allegedly discriminatory action," Holcomb, 433 F.3d at 896, the defendant has satisfied its burden under the McDonnell Douglas framework, thereby allowing "the presumption of discrimination [to] simply drop[] out of the picture," id. (internal quotation marks and citation omitted). Thus, "the only question is whether the defendant intentionally discriminated against the plaintiff," Czekalski v. Peters, 475 F.3d 360, 364 (D.C. Cir. 2007) (quoting United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983)) (internal quotation marks and other citations omitted), and "the plaintiff can survive summary judgment only by . . . prov[ing] that a reasonable jury could infer that the employer's given explanation was pretextual and that this pretext shielded discriminatory

motives," Jackson, ___ F.3d at ____, 2007 WL 2275215, at *2 (citations omitted); cf. Holcomb,

433 F.3d at 895 (stating that there is a genuine issue of material fact only "if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party") (internal quotation marks

and citation omitted).[19]

The District of Columbia Circuit has held that "[i]n order to justify an inference of

discrimination, the qualifications gap [between the selectee and the plaintiff] must be great

enough to be inherently indicative of discrimination."[20]  Holcomb, 433 F.3d at 897 (citations

omitted).  Otherwise, the Court may assume that "[w]hen an employer says it made a hiring

decision based on the relative qualifications of the candidates, . . . a reasonable juror who might

disagree with the employer's decision, but would find the question close, would not usually infer

discrimination on the basis of qualifications alone." Jackson, ___ F.3d at ____, 2007 WL

---

[19]  In this regard, the Court must consider, "in its full context," all of the evidence in the record.  Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1290 (D.C. Cir. 1998) (en banc).  This includes "(1) evidence establishing the plaintiff's prima facie case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer."  Holcomb, 433 F.3d at 897 (citation omitted).  If the plaintiff is ultimately "unable to adduce evidence that could allow a reasonable trier of fact to conclude that [the defendant's] proffered reason was a pretext for discrimination, summary judgment must be entered against [the plaintiff]."  Paquin v. Fed. Nat'l Mortgage Ass'n, 119 F.3d 23, 27-28 (D.C. Cir. 1997) (citation omitted).

[20]  To make this showing, plaintiffs are free not simply "to compar[e] [their] qualifications against those of the successful applicant[s]," but "to expose other flaws in the employee's explanation, including . . . showing [that] the employer has misstated [their] qualifications."  Holcomb, 433 F.3d at 897 (citation omitted); see Jackson, ___ F.3d at ____, 2007 WL 2275215, at *3 (stating that "a plaintiff may present evidence to show that the employer's qualifications-based explanation is incorrect or fabricated") (internal quotation marks and citations omitted).  While the plaintiff here certainly argues that the defendant did not accurately prioritize the relevant qualifications of the candidates, see Pl.'s Opp. at 13-14 (comparing his "academic and certification credentials" to those of Leatherman), he does not claim that the defendant has actually "misstated" what his qualifications for the position are, Holcomb, 433 F.3d at 897 (citation omitted); see generally Pl.'s Opp.; Pl.'s Suppl. Opp.—nor, given the "rather explicit misstatement" posited by the District of Columbia Circuit "as the type that might permit an inference of discrimination," could he credibly do so, Holcomb, 433 F.3d at 899 (quoting Aka, 156 F.3d at 1295, as stating that a material misstatement would occur "[i]f the employer says that it did not hire the plaintiff because he did not speak Portugese, the plaintiff can show that he did speak Portugese, and . . . the employer knew it") (emphasis in original).

2275215, at *2 (internal quotation marks and citation omitted).  Rather, "[i]n a close case, a reasonable juror would usually assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call."  Holcomb, 433 F.3d at 897 (internal quotation marks and citation omitted).  On the other hand, if a factfinder could conclude, based on the evidence presented, "that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less qualified candidate, something that employers do not usually do," absent "some other strong consideration, such as discrimination."  Jackson, ___ F.3d at ____, 2007 WL 2275215, at *2 (internal quotation marks and citation omitted) (emphasis added); see also Holcomb, 433 F.3d at 897 (stating that "a factfinder could infer discrimination if the evidence showed a reasonable employer would have found the plaintiff significantly better qualified for the job but nevertheless failed to offer the position to [him]") (citation omitted) (emphasis in original).

"Once [an] employer has articulated a non-discriminatory explanation for its action, the issue is not the correctness or desirability of [that explanation] but whether the employer honestly believes in the reasons it offers."  George, 407 F.3d at 415 (internal quotation marks and citation omitted).  The plaintiff may then attempt to demonstrate the pretextual nature of the employer's stated motive "either directly by persuading the [C]ourt that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  Id. at 413 (internal quotation marks and citation omitted).  The plaintiff predominantly adopts the latter tactic, arguing that the defendant's stated explanation for his non-

selection—the purportedly superior qualifications of the other two candidates for the Acting

Assistant Supervisor position—is not credible because "both [his] application and the panels's

knowledge of [his] training, experience, and certifications demonstrate that he is 'significantly

better qualified' for the position to such a point that a 'wide and inexplicable gulf' exists between

[him] and the other [candidates]."[21]  Pl.'s Suppl. Opp. at 12.

    The plaintiff proffers two major bases of support for his assertion that he was "clearly

better qualified for the promotion to the position of [Acting Assistant Supervisor] than the

selectees."  Pl.'s Suppl. Opp. at 14.  First, he adverts to the fact that he is "an experienced

Stationary Engineer" with "vast HVAC experience," including having acquired an HVAC

Master's license and other HVAC-related training that selectees Turner and Leatherman do not

possess.  Id. at 16; see id. at 11-16.  Second, the plaintiff provides an affidavit from James

Fletcher, a former Acting Assistant Supervisor who supervised both the plaintiff and Leatherman

and who believes that the plaintiff's qualifications for the Acting Assistant Supervisor position

were "markedly superior."  Pl.'s Opp., Ex. 1 (March 10, 2006 affidavit of James Fletcher)

("Fletcher Aff.") at 2; see Pl.'s Opp. at 5; Pl.'s Suppl. Opp. at 6.  For the reasons below, the

Court finds that a reasonable jury could not conclude from this evidence that the plaintiff was

"significantly better qualified for [the Acting Assistant Supervisor position]" or that "the adverse

---

[21] In addition, in an attempt to "persuad[e] the [C]ourt that a discriminatory reason more likely motivated the employer," George, 407 F.3d at 413 (internal quotation marks and citation omitted), the plaintiff claims that "[i]n the past thirty years there have only been three African-American Stationary Engineers and never an African-American manager at the BEP Power Plant," Pl.'s Suppl. Opp. at 9.  Even assuming the truth of these representations, but see Answer at 4 (disputing the plaintiff's allegations), such a bald assertion as to the lack of African-Americans as Stationary Engineers and in the BEP's supervisory ranks, without specific "evidence that the defendant employs [African-Americans in those positions] at rates far below their numbers in the applicant pool and the general population," is clearly insufficient to create a genuine issue of fact as to whether the BEP's stated reason for failing to select the plaintiff for a supervisory position was indeed pretextual.  Aka, 156 F.3d at 1295 n.11.

employment decision was [otherwise] made for a discriminatory reason." <u>Holcomb</u>, 433 F.3d at 896-97 (internal quotation marks and citation omitted).  In addition, because the plaintiff's submission of the Fletcher affidavit implicates certain threshold evidentiary questions, the Court must evaluate the sufficiency of that evidence before turning to the plaintiff's other grounds for challenging the defendant's non-discriminatory explanation for its selection decisions.  <u>See</u> Pl.'s Suppl. Opp. at 11-16.

### A.  The Fletcher Affidavit

In his brief and unadorned affidavit, Fletcher states that he is a former Acting Assistant Supervisor and that he is now retired from the BEP.[22]  Fletcher Aff. ¶ 1.  He also states that he is a white male, <u>id.</u>, and that he "[has] supervised the work of both Kendall Leatherman and [the plaintiff]," <u>id.</u> ¶ 5, although he does not provide any detail as to the circumstances or duration of this supervision.  Fletcher then makes the following relevant representations:  First, he states his belief, "based upon [his] observations and experience, . . . that at the time of the selection at issue, [the plaintiff's] qualification[s] and prior experience as a [S]tation[a]ry [E]ngineer were markedly superior to those of selectee Kendal[l] Leatherman, who was not experienced or trained as a Stationary Engineer."  <u>Id.</u> ¶ 3; <u>see</u> <u>also</u> <u>id.</u> ¶ 6 (stating that the plaintiff "is an experienced, excellent Stationary Engineer" and that "Kendall Leatherman had little experience as a Stationary Engineer").  Second, he states that the plaintiff's qualifications for [the Acting Assistant Supervisor positions at issue in this case] were superior to those of selectee Kendal[l] Leatherman.  <u>Id.</u> ¶ 4.  Third, he states that "[b]ased upon [his] observations, [the plaintiff's]

_____

[22]  Fletcher's affidavit is two pages long and consists of seven short paragraphs.

knowledge, skills, abilities, qualifications[,] and vast prior experience are markedly superior to those of selectee Kendall Leatherman."[23] Id. ¶ 5.

The defendant contends that the Fletcher affidavit does not conform to the requirements set forth in Federal Rule of Civil Procedure 56(e) for the submission of affidavits in connection with summary judgment motions because (1) "there is no foundation for Mr. Fletcher's speculation, conclusions[,] and opinions," Def.'s Suppl. Reply at 16, and therefore the affidavit is not made on Fletcher's "personal knowledge," Fed. R. Civ. P. 56(e); and (2) the "[p]laintiff failed to identify Mr. Fletcher as a relevant witness during the discovery period in this case," Def.'s Suppl. Reply at 17, and therefore his statements "would [not] be admissible in evidence," Fed. R. Civ. P. 56(e).  The Court will examine each of these arguments in turn.

First, assuming that Fletcher did indeed serve as an Acting Assistant Supervisor who supervised the work of the plaintiff and Leatherman to at least some extent, he can therefore presumably speak with some measure of experience regarding the duties and demands of the position and, more importantly, share his personal observations as to the respective qualifications of the plaintiff and Leatherman to serve as Acting Assistant Supervisors themselves.[24]  The Court

---

[23] Fletcher also, inter alia, represents his belief "that race discrimination was the motivating factor in [the plaintiff's] non-selection for [Acting Assistant Supervisor]," Fletcher Aff. ¶ 6; see also id. ¶¶ 3 (stating that "[the] BEP's non-selection of [the plaintiff] by management was motivated by discrimination"), 4 (stating his belief that "[the] BEP intentionally promoted a less experienced worker"), a statement that, without any substantiation or explanation grounded in his "personal knowledge" of the selection process, Fed. R. Civ. P. 56(e), is purely conclusory and speculative, and thus of no evidentiary worth.  See Pub. Citizen Health Research Group v. FDA, 185 F.3d at 908  (stating that "conclusory allegations unsupported by factual data will not create a triable issue of fact" sufficient to withstand summary judgment) (internal quotation marks and citations omitted).

[24] Of course, it is true that Bowie and Rye have also supervised the plaintiff and Leatherman, and are therefore presumably personally knowledgeable about their performances as Stationary Engineers as well.  See Bowie Aff. at 2; Rye Dep. at 7-8.  It is also true, as the defendant argues, that Fletcher was not involved in the selection process and thus has no informed, personal knowledge of the manner in which the candidates' respective qualifications were presented to the recommending panel in their application packages and through their oral

(continued...)

therefore concludes that Fletcher's statements as to the relative qualifications of the plaintiff and

Leatherman as both Stationary Engineers and Acting Assistant Supervisors were "made on

personal knowledge" and comport with Rule 59(e) in that respect.[25]  Fed. R. Civ. P. 59(e).

Nevertheless, it is clear that Fletcher's affidavit cannot be considered in connection with

the defendant's motion for summary judgment.  Rule 59(e) states, in relevant part, that

"[s]upporting and opposing affidavits . . . shall set forth such facts <u>as would be admissible in</u>

<u>evidence</u>."  <u>Id.</u> (emphasis added).  In addition, Federal Rule of Civil Procedure 37(c)(1) states

that evidence that was not disclosed to the other party during discovery "is not, unless such

failure is harmless, permitted to [be] use[d] as evidence at a trial, at a hearing, or on a motion."

Fed. R. Civ. P. 37(c)(1).  The defendant contends, and the plaintiff does not dispute, that "[the]

[p]laintiff failed to identify Mr. Fletcher as a relevant witness during the discovery period in this

case."  Def.'s Reply at 13 (noting that Fletcher was not mentioned during the plaintiff's

deposition or identified in the plaintiff's answers to the defendant's interrogatories or in the

Federal Rule of Civil Procedure 26(a)(1) disclosures); Def.'s Suppl. Reply at 17 (same).  As a

result, and purely because of what appears to be either the plaintiff's attorney's lack of diligence

in identifying Fletcher as a witness or the plaintiff's failure to timely make Fletcher's identity

---

[24](...continued)
interviews.  <u>See</u> Def.'s Suppl. Reply at 16.  Nor is there any indication that Fletcher's views as to the plaintiff's
allegedly superior qualifications for the position of Acting Assistant Supervisor were formed as a result of any
knowledge of, or reference to, the formal KSAs for the position relied upon by the rating and interviewing panels.
<u>See id.</u>  Nevertheless, "view[ing] the evidence in the light most favorable to the non-moving party," <u>Holcomb</u>, 433
F.3d at 895 (internal quotation marks and citation omitted), it is arguable that Fletcher's statements, if considered,
would raise, at the very least, a genuine issue of material fact sufficient to permit the plaintiff to withstand summary
judgment on the issue of Leatherman's selection.

[25]  As noted below, however, the plaintiff's relative qualifications as a Stationary Engineer are only relevant
to his Title VII claim insofar as they shed light on his relative qualifications as an Acting Assistant Supervisor, as the
plaintiff makes no representation that the required KSAs for the two positions are identical, or even substantially
similar.

known to his attorney, the defendant was denied the opportunity to depose Fletcher and thereby test the statements made in the affidavit.  See Cornwell v. Electra Fed. Credit Union, 439 F.3d 1018, 1026 n.3 (9th Cir. 2006) (affirming a district court's refusal to consider the statement of a witness not identified in discovery even where the evidence adduced by the unidentified witness "would have weighed strongly against summary judgment"); cf. id. at 1027 (stating that "[the] [p]laintiff must accept the consequence of his choice not to pursue discovery of [the witness's] testimony before the discovery cutoff[,] . . . [because his attorney] surely knew or should have known that [the] [d]efendants' motions for summary judgment would test the factual sufficiency of [the plaintiff's] claims"); Hussain v. Principi, 344 F. Supp. 2d 86, 93 (D.D.C. 2004); (granting the defendant's motion for summary judgment where "[the] plaintiff had more than adequate time for discovery here, but his counsel did not take advantage of it").  Moreover, the Court notes that the plaintiff had ample opportunity, both at the August 15, 2006 status hearing and in his supplemental opposition to the defendant's motion for summary judgment, to address his failure to identify Fletcher as a witness during the discovery period and to request, if appropriate, that discovery be reopened on a limited basis—as it was for the taking of the depositions of Rye and Bowie, see supra, n.14; August 17, 2006 Order—to allow the defendant a chance to depose Fletcher.  The plaintiff did not do so.[26]  Nor would it now be appropriate, at this late stage, for the Court to acquiesce to any request by the plaintiff (if such request had been made, which it was not) to reopen discovery to permit the defendant to depose Fletcher.  Cf. Berkeley v. Home Ins.

---

[26] Indeed, when the plaintiff submitted his supplemental opposition to the defendant's motion for summary judgment on October 31, 2006, he had been aware for seven months of the defendant's Rule 59(e) objections to the Fletcher affidavit.  Yet, not only did the plaintiff again expressly rely on Fletcher's statements, see Pl.'s Suppl. Opp. at 6 (stating that "Fletcher will testify, based on his observations and experience[,] that at the time of the selection at issue," the plaintiff's qualifications "were markedly superior to those of [Leatherman]"), but he did not provide any explanation or response whatsoever to the evidentiary objections raised by the defendant.

Co., 68 F.3d 1409, 1414 (D.C. Cir. 1996) (stating that Rule 56(f), which permits a party to move

for additional discovery, "is not properly invoked to relieve counsel's lack of diligence");

Cornwell, 439 F.3d at 1027 (stating that "[a]ttempting to secure discovery after a discovery

cutoff date does not cure a party's failure to conduct diligent discovery beforehand"); Hussain,

344 F. Supp. 2d at 93 (stating that "[s]ince the non-moving party has not diligently pursued

discovery of the evidence, this Court is under no obligation to grant belated requests for

discovery") (internal quotation marks and citation omitted).  It is the Court's candid conclusion

that the plaintiff "had ample opportunity to [identify Fletcher during discovery], but failed to do

so," Cornwell, 439 F.3d at 1026, and that this failure is not "harmless" under Rule 37(c).

Accordingly, the Court cannot consider the statements made in Fletcher's affidavit in connection

with the defendant's motion for summary judgment.  Any other result would serve to encourage

untimely disclosure of witnesses and would be inherently unfair to the defendant.  See Fed. R.

Civ. P. 37(c)(1).

### B.  The Plaintiff's HVAC Experience

In arguing that there existed "a wide and inexplicable gulf" between his qualifications for

the Acting Assistant Supervisor position and those of Turner and Leatherman, Pl.'s Suppl. Opp.

at 10, the plaintiff expends a great deal of energy attempting to demonstrate his superior

qualifications and longer tenure in his current position as a Stationary Engineer.  See id. at 3

(arguing that the plaintiff's "qualification[s] and prior experiences as a [S]tation[a]ry [E]ngineer

were markedly superior to those of selectee Kendal[l] Leatherman, who was not experienced or

trained as a Stationary Engineer"), 14 (arguing that the plaintiff was "clearly better qualified for

the promotion to the position of [Acting Assistant Supervisor] than the selectees" because he

"has been in this field for approximately thirty years, at least one decade longer than either of the other two applicants," and because his "training and experience is in air conditioning and refrigeration"), 15 (comparing the plaintiff's HVAC experience and training to that of Leatherman).  In so doing, the plaintiff appears to suggest, without any corroborative evidence, that an individual who is more qualified to be a Stationary Engineer must <u>also</u> be more qualified to be an Acting Assistant Supervisor, an argument that is belied by the different skillset and different range of experience applicable to the two positions.  <u>See</u> Def.'s Suppl. Reply at 7 (arguing that "[the] [p]laintiff is comparing apples to oranges because he ignores the KSAs, the factors actually governing the comparison of the applicants for the position [of Acting Assistant Supervisor]").

In particular, the plaintiff leans heavily on what he considers to be his comparatively greater "experience in HVAC/utility based mechanical operation."  Pl.'s Resp. ¶¶ 21-22; <u>see</u> Pl.'s Suppl. Opp. at 16 (contrasting the plaintiff's "vast HVAC experience" with Leatherman's "limited [HVAC] knowledge or experience").[27]  In this regard, the plaintiff contends that "[t]he obvious comparisons between [his] application and the other selectees, especially Mr. Leatherman, jump off the page with their stark inequalities in education, work experience, tenure at the BEP, certifications, etc."  <u>Id.</u> ¶ 22; <u>see also</u> <u>id.</u> ¶ 23 (stating that "despite his limited knowledge or experience in high or low pressure steam distribution systems for [HVAC] and refrigeration systems, and air and water pressure systems, [Leatherman] was selected over [the] [p]laintiff, an experienced Stationary Engineer").  It is unnecessary for the Court to decide

---

[27]  The Court again notes the plaintiff's peculiar focus on the comparative qualifications of Leatherman in his pleadings, to the near-total exclusion of any mention of Turner.

whether the plaintiff has, as he claims, greater experience, education, and qualifications in the HVAC area than either of the two selectees, for it is clear from the record that HVAC experience was neither the determinative nor even the primary criterion for assessing the qualifications of candidates for a position as an Acting Assistant Supervisor.[28]  See Rye Dep. at 48:20-49:10 (stating that HVAC experience is "only part of the job" and that there were "certain things that [Leatherman] had more experience [in than the plaintiff]").  Nowhere does the plaintiff satisfactorily address, let alone refute, Bowie's representation that "having an HVAC license was not necessary [or] required" because the position at issue "is an acting assistant supervisory position, not a mechanic stationary engineer position."[29]  Bowie Dep. at 52:13-17.

Indeed, the plaintiff concedes that supervisory responsibilities comprise a significant portion of the duties of an Acting Assistant Supervisor.  See Pl.'s Suppl. Opp. at 16 (stating that the Acting Assistant Supervisor "supervises employees engaged in the operation, maintenance and repair of the Bureau electric substation") (quoting Position Description at 2).  The plaintiff also does not dispute that the KSAs for the Acting Assistant Supervisor position require, inter alia, "[the] [a]bility to exercise technical supervision over subordinate craft employees, . . . [the]

---

[28]  In any event, it is at least somewhat in dispute whether the plaintiff's performance as Stationary Engineer, let alone his qualifications for Acting Assistant Supervisor, were "markedly superior" to that of Leatherman.  Pl.'s Suppl. Opp. at 20.  Although Rye stated that the plaintiff knew his job as Stationary Engineer "very well," Rye Dep. at 28:15-18, he also contended that Leatherman knew "the activities and the requirements of the job as well as [the plaintiff]," id. at 31:5-8.  In Rye's estimation, based on his personal observations as the supervisor of both individuals, the plaintiff is not "vastly more qualified as a [S]tationary [E]ngineer than . . . Leatherman."  Id. at 31:12-22.

[29]  Furthermore, the simple fact that the plaintiff has had more years of experience, either as a Stationary Engineer at the BEP or in the general field of HVAC, does not itself compel the conclusion that the plaintiff was "significantly better qualified" for the Acting Assistant Supervisor position.  Holcomb, 433 F.3d at 897 (internal quotation marks and citation omitted); see Barnette v. Chertoff, 453 F.3d 513, 516-17 (D.C. Cir. 2006) (finding that the plaintiff had not demonstrated a "significant qualifications differential" when she had three more years of supervisory experience than the selectee, as well as a markedly longer tenure of employment at the agency).

ability to communicate effectively, both orally and in writing[,] . . . [and the] [a]bility to direct

the distribution of work in accordance with the work of the program." See Rating Sheets at 4-18.

Moreover, the plaintiff nowhere contests the defendant's twin representations that Turner and

Leatherman (1) possessed greater supervisory experience than the plaintiff; and (2) were better

able to articulate the details of that supervisory experience and, specifically, its applicability to

the Acting Assistant Supervisor position through their application materials and oral interviews.

See generally Bowie Aff. at 3-8.  Finally, by quoting extensively from the relevant position

description, the plaintiff implicitly acknowledges that HVAC experience is only one relevant

criterion upon which candidates for Acting Assistant Supervisor are appropriately evaluated.  See

Pl.'s Suppl. Opp. at 15-16.  In short, the plaintiff does not argue, nor could he, that a reasonable

employer would have concluded that the candidate with the best qualifications for the position of

Stationary Engineer was necessarily, or even likely, the candidate with the best qualifications for

the position of Acting Assistant Supervisor.

     At most, the plaintiff has demonstrated that he was more qualified than Turner and

Leatherman with respect to certain aspects of the position description of Acting Assistant

Supervisor and less qualified with respect to other aspects.  See id. at 15 (stating that "[the]

[p]laintiff has an HVAC Master's License from the District of Columbia, whereas the two

selectees do not possess such an important license").  This is plainly not enough to allow a

reasonable juror to "infer that the [defendant's] given explanation was pretextual and that this

pretext shielded discriminatory motives." Jackson, ___ F.3d at ____, No. 06-5053, 2007 WL

2275215, at *2 (citations omitted); see Holcomb, 433 F.3d at 897 (stating that "[i]n order to

justify an inference of discrimination, the qualifications gap [between the selectee and the

plaintiff] must be great enough to be inherently indicative of discrimination").  Rather, "as the KSA scores indicate, the evidence presented by [the plaintiff] does not suggest that he was 'significantly better qualified' than [either Turner or Leatherman]."[30]  <u>Jackson</u>, ___ F.3d at ____, 2007 WL 2275215, at *3 (citation omitted); <u>see</u> Rating Sheets at 3 (giving Leatherman a composite score of 22 and Turner and the plaintiff each a composite score of 17).

In sum, the plaintiff does not, and cannot, dispute that "[supervisory] experience was clearly encompassed by the qualifications listed in [the BEP's posted description of the Acting Assistant Supervisor position]."  <u>Jackson</u>, ___ F.3d at ____, 2007 WL 2275215, at *3 (citation omitted); <u>see</u> Pl.'s Opp. at 15-16 (citing Position Description at 2).  Nor does he contest the fact that the applicable KSAs for the position place a strong emphasis on both supervisory qualifications and oral and written communication skills, areas in which he does not claim to be "significantly better qualified" than Turner or Leatherman.  <u>Holcomb</u>, 433 F.3d at 897; <u>see generally</u> Pl.'s Opp.; Pl.'s Suppl. Opp.  Thus, even if the plaintiff's comparatively greater HVAC experience is applicable to the duties of the Acting Assistant Supervisor in such a way as to give him an advantage over Turner and Leatherman in the position <u>in that particular respect</u>, "courts must defer to the employer's decision as to which qualities required by the job (substantive versus managerial) it weighs more heavily." <u>Barnette v. Chertoff</u>, 453 F.3d 513, 517 (D.C. Cir. 2006) (citation omitted).  Here, the defendant has represented that it valued Turner and Leatherman's greater supervisory qualifications (as well as their ability, both in their applications and before the interview panel, to articulate those qualifications) more than the plaintiff's greater

---

[30]  It is again helpful to note that the calculation of each candidates' KSA score was not made by the interviewing panel of Rye, Bowie, and Stevenson, but by a completely different panel of individuals.  <u>See</u> Rating Sheets at 3.

HVAC experience, see, e.g., Bowie Aff. at 3-8., and absent some evidence (which the plaintiff

has not provided) that the defendant does not "honestly believe[] in the reasons it offers,"

George, 407 F.3d at 415 (internal quotation marks and citation omitted), the Court "will not

second-guess how [the defendant] weigh[ed] particular factors in the hiring decision," Jackson,

___ F.3d at ____, 2007 WL 2275215, at *3 (citation omitted); see also id. (stating that "courts

must not second-guess an employer's initial choice of appropriate qualifications[,] [but] rather . .

. defer to the employer's decision of what nondiscriminatory qualities it will seek in filling a

position") (internal quotation marks, citations, and bracketing omitted).  It may certainly be true,

as the plaintiff claims, that HVAC experience, no less than supervisory experience, is a

legitimate component of the Acting Assistant Supervisor position. But the District of Columbia

Circuit could not put it any more clearly:  "The fact that an employer based its ultimate hiring

decision on one or more specific factors encompassed within a broader and more general job

description does not itself raise an inference of discrimination sufficient to overcome summary

judgment." Id. at ____, 2007 WL 2275215, at *4.

      Therefore, after reviewing the totality of the evidence in the light most favorable to the

plaintiff, the Court cannot say that he was better qualified, let alone significantly better qualified,

for the position of Acting Assistant Supervisor than were Turner and Leatherman, given the

emphasis placed on supervisory qualifications and oral and written communication skills in that

position's list of KSAs.  It is clear from the sworn statements of members of the recommending

panel that they believed that a demonstrated ability to supervise subordinates, as clearly

articulated through the applicants' application packages and interviews, was a more valuable

quality in candidates for the Acting Assistant Supervisor position than was technical experience

in a specific area such as HVAC or electrical repair.  Furthermore, the defendant represents that

each candidate was evaluated with this priority in mind, <u>see</u> Bowie Aff. at 3-8, and the plaintiff

has adduced no facts to suggest that this nondiscriminatory reason for his non-selection is

somehow "unworthy of credence."  <u>George</u>, 407 F.3d at 413 (internal quotation marks and

citation omitted).  And, of course, even assuming that the plaintiff was <u>equally</u> qualified for the

position as the two selectees (a finding the evidence also does not support), "the [C]ourt must

respect the [BEP's] unfettered discretion to choose among [the three] candidates."  <u>Fischbach</u>, 86

F.3d at 1183 (citations omitted); <u>see</u> <u>Barnette</u>, 453 F.3d at 516 (noting that "an employer has the

discretion to choose among equally qualified candidates") (quoting <u>Texas Dep't of Comm.

Affairs v. Burdine</u>, 450 U.S. 248, 259 (1981)) (internal quotation marks omitted); <u>Stewart v.

Ashcroft</u>, 352 F.3d 422, 429 (D.C. Cir. 2003) (affirming summary judgment in favor of employer

on Title VII claim where the plaintiff "was simply not discernibly better than" the selectee).  At

bottom, "[t]his Court will not reexamine governmental promotion decisions where it appears the

Government was faced with a difficult decision between two qualified candidates, particularly

when there is no other evidence that race played a part in the decision."  <u>Stewart</u>, 352 F.3d at

430.  Here, the plaintiff simply "offers no basis for questioning [the BEP's] judgment that

[Turner and Leatherman] [were] better suited for the [Acting Assistant Supervisor] position."

<u>Barnette</u>, 453 F.3d at 517-18.

## IV. Conclusion

As stated above, "[s]hort of finding that the employer's stated reason [for its selection

decision] was indeed a pretext [for unlawful discrimination,] . . . the [C]ourt must respect the

employer's <u>unfettered discretion to choose among qualified candidates</u>."  <u>Fischbach</u>, 86 F.3d at

1183 (citations omitted) (emphasis added).  Here, the plaintiff has not "set forth specific facts

showing that there is a genuine issue for trial" with regard to his relative qualifications for the

Acting Assistant Supervisor position, Fed. R. Civ. P. 56(e), and the Court has no doubt, on the

record before it, that the BEP's selection of Turner and Leatherman over the plaintiff in this case

is exactly the sort of discretionary decision that is properly left undisturbed.  Accordingly, the

Court will grant the defendant's motion for summary judgment.

      **SO ORDERED** this 28th day of August, 2007.[31]

                                                 REGGIE B. WALTON
                                     United States District Judge

---

[31] An Order consistent with the Court's ruling accompanies this Memorandum Opinion.